**HART v. UNITED STATES (HART et al., third-party defendants).**

**Civ. No. 9303.**

United States District Court Third District New Jersey.

June 30, 1949.

Snevily & Ely, Westfield, N. J., for plaintiff.

Personius, Swan & Marinan, Elmira, N. Y., for defendant.

SMITH, District Judge.

This is a civil action on a policy of insurance on the life of one Cameron M. Hart, deceased, issued pursuant to the National Service Life Insurance Act of 1940, as amended, 38 U.S.C.A. § 801 et seq. Liability on the policy of insurance is admitted by the United States of America, and the present controversy is between the plaintiff Helen F. Hart, the widow of the decedent, and the defendant Josiah F. Hart, the father of the decedent, each of whom asserts a claim as the sole beneficiary.

Findings of Fact.

I. Pursuant to the provisions of the Act, and on the application of the decedent, a policy of insurance on the life of the decedent was issued and became effective on September 1, 1942. The defendant was designated therein as the beneficiary, and Margaret C. Hart, the mother of the decedent, was designated therein as the contingent beneficiary.

II. The decedent completed his preliminary training and entered upon active duty as an officer on May 28, 1943, when he was commissioned at Craig Field, Selma, Alabama. The plaintiff and decedent were married on the following day, May 29, 1943.

III. It appears from the undisputed testimony that on May 27th or 28th, 1943, and immediately prior thereto, the decedent informed one Robert D. Hays of his intention to change the beneficiary of the insurance. It further appears from the undisputed testimony that on May 28, 1943 the decedent informed the plaintiff that "he had changed the beneficiary on his insurance." The pertinent testimony of these witnesses is quoted in the appendix hereto annexed.

IV. The decedent, while in military service, executed the following documents:

(a) An Authorization for Allotment of Pay, dated May 28, 1943, which authorized payment of $6.60 per month to the Director of Insurance to cover the payment of premiums. This is the only document bearing the said date that has been offered in evidence. It appears from the testimony of Robert D. Hays that other documents were executed by the officers on the said date.

(b) An Officer's Personal Questionnaire, dated March 18, 1944. This document contains, in addition to other information, the following pertinent reference to life insurance:

same witnesses. Document (b) was executed on the following day. It is reasonable to infer that the decedent was then engaged in putting his personal affairs in order, preparatory to his embarkation in May of 1944.

(e) A last will and testament, dated April 22, 1944. This will is identical with the first will, except that it appears to be entirely in the handwriting of the deceased.

V. There has been offered in evidence a copy of an AAF Personal Affairs Statement, which does not bear the signature of the decedent. The original of this document, which has been produced at the request of the Court since the trial, does not bear the signature of the decedent. This lack of signature would seem to cast some doubt on the authenticity of the document, but the information therein contained might support an inference that it was prepared by the decedent.

VI. The pertinent entries in the Personal Affairs Statement read as follows:

"The status of my personal affairs reviewed with the assistance of the Personal Affairs Officer at Craig Field, Alabama

| "National Life Insurance (Service) | 10,000 | 5 Yr. Term — Helen F. Hart | |
| --- | --- | --- | --- |
| | Amount | Type | Name of Beneficiary |
| | 1,000 | 20 Pay | Helen F. Hart |
| Civilian Life Insurance | Amount | Type | Name of Beneficiary" |

This reference is evidence that a change of beneficiary had been made. (See the cases hereinafter cited).

(c) A General Power of Attorney, dated March 17, 1944, in which the decedent appointed the plaintiff his attorney in fact, and the defendant his attorney in fact "in the event of the death of the" plaintiff.

(d) A last will and testament, dated March 17, 1944, in which he bequeathed and devised his entire estate, except that required for the payment of debts, etc., to the plaintiff, whom he appointed executrix.

Documents (c) and (d) were executed on the same date and in the presence of the

.....on.....28 June 1945 . . . is indicated below.

Note.—Boxes checked (x) indicate items which require no further action as of latest date shown on this form.

Boxes not checked ( ) indicate items which require or may require further action.

1. Government Life Insurance.

(x) (a) I have (now in force or applied for) $10,000....NSLI on the 5 yr level term premium....plan, effective....May 1942;

(x) (c) And am paying a total premium of $6.60....Mo payable by allotment, effective May 1943.

(x) (d) The beneficiaries designated on my government life insurance are:

Principal...Helen F. Hart...Wife....... $10,000
<u> </u>
      (Name)    (Relationship)   (Portion)

Contingent...Josiah F. Hart...Father... $10,000
<u> </u>
      (Name)     (Relationship) (Portion)

**2. Commercial Life Insurance.**

(x) (a) I have requested the A.G.O. to notify the following life insurance company(s) in the event of my death:

| Amount of Insurance | Name of Insurance Company | Home Office Address |
|---|---|---|
| $1,000 ...............Aetna Life Insurance Co., .......... Hartford, Conn. | | |

(x) (d) The beneficiaries on my commercial life insurance contract(s) listed in paragraph 2(a) above are:

Principal ...Helen F. Hart... Wife
<u> </u>
     (Name)     (Relationship)

Contingent ..........................
<u> </u>
     (Name)    (Relationship)

(x) 9. General Power of Attorney.

I have executed a general power of attorney, dated....April 1944....naming ....Helen F. Hart....my attorney in fact.

(x) 10. Will for Serviceman.

I have executed a will (dated....April 1944....) which is located....in wife's possession.

(x) 14. Six Months' Gratuity.

On .....27 June 1945....., I designated.......Helen F. Hart .................
<u> </u>
          (Name)

709 Mountain Ave., Westfield, New Jersey.........Wife .........................
<u> </u>
    (Address)         (Relationship)

(first beneficiary) to receive any Six Months' Gratuity to which he/she may be entitled.

I request that a copy of this Statement, together with copies of available pertinent papers, be forwarded to my wife, Helen F. Hart......at......709 Mountain Ave., Westfield, New Jersey."

VII. The Personal Affairs Statement contains the following instructions: "AAF Personal Affairs Statement is not to be used, either as a substitute for, or in lieu of, authorized forms or established procedures for effecting desired personal affairs actions. The purpose of this form is to provide a consolidated record of all *Personal Affairs Actions Taken by Previous Accomplishment of Official Forms.* Accordingly, prior to signing this statement, any action will be accomplished in the prescribed official manner." (Emphasis by the Court). The entries in the Personal Affairs Statement, considered in the light of these instructions, will support an inference that a change of beneficiary had been effected.

VIII. The decedent died on January 16, 1946.

**Discussion.**

The pertinent provisions of the Act, 38 U.S.C.A. § 802(g), reserve to the insured, "subject to regulations, * * * the right to change the beneficiary * * * of (his) insurance without the consent of such beneficiary." The regulations promulgated by the Administrator contains the following provision: "Change of beneficiary to be effective must be made by notice in writing signed by the insured and forwarded to the Veterans Administration by the insured or his agent and contain sufficient information to identify the insured. Whenever practi-

cable such notices shall be given on blanks prescribed by the Veterans Administration." (Regulation 10.3447).

There is no evidence before the Court of literal compliance with the regulation, but the lack of this evidence is not determinative of the narrow question here presented. The courts have uniformly held that literal compliance with the regulation is not required. It clearly appears from the undisputed testimony, supported by the documentary evidence, that the decedent expressed an intent to change the beneficiary. The narrow question here presented is whether or not the steps taken by the decedent effected the contemplated change. We find, contrary to our earlier thought, that a change of beneficiary was effected.

We must frankly concede that at the time of the trial, and before our study of the reported decisions, we entertained considerable doubt as to the sufficiency of the evidence offered by the plaintiff in support of her claim. The reported decisions have not completely dispelled our doubts, but we feel impelled to follow the precedents that have been established in other circuits, and more recently in our own. Senato v. United States, 2 Cir., 173 F.2d 493; Farmakis v. Farmakis, D.C.Cir., 172 F.2d 291; Cohn v. Cohn, D.C.Cir., 171 F.2d 828; Kendig v. Kendig, 9 Cir., 170 F.2d 750; Shapiro v. United States, 2 Cir., 166 F.2d 240; Collins v. United States, 10 Cir., 161 F.2d 64; Mitchell v. United States, 5 Cir., 165 F.2d 758; McKewen v. McKewen, 5 Cir., 165 F.2d 761; Roberts v. United States, 4 Cir., 157 F.2d 906; and, Flood v. United States, D.C., 78 F.Supp. 420, affirmed 3 Cir., 172 F.2d 221. We have examined the record in the case of Flood v. United States, and it is our opinion that the evidence presented in the instant case was far more persuasive than the evidence presented in that case.

It is argued by the defendant that on May 28, 1943, when the change of beneficiary was made, the plaintiff could not qualify as a beneficiary. This argument is predicated upon the express provisions of the Act, 38 U.S.C.A. § 802(g), which reads as follows: "The insured * * * shall

* * * at all times have the right to change the beneficiary or beneficiaries of such insurance * * * but only within the classes herein provided." We cannot agree with the argument.

We cannot determine with certainty the exact date on which the change of beneficiary was effected because the evidence before us is inconclusive as to the exact date. We shall assume, however, for the purpose of discussion, that the change of beneficiary was made on May 28, 1943, when the plaintiff was not married to the decedent. It is our opinion that this fact would not affect her rights under the policy where, as here, the plaintiff became the wife of the decedent immediately thereafter and their marital status continued until the decedent's death, when liability under the policy matured.

## Conclusion.

The decedent expressed an intent to effect a change of beneficiary and the steps thereafter taken by him were adequate to effect that change. A judgment in the full amount of the policy shall be entered in favor of the plaintiff and against the United States of America.

## Appendix.

### Testimony of Robert D. Hays.

"Q. State your name. A. Robert D. Hays.

"Q. Were you formerly in the army of the United States? A. Yes.

"Q. Did you hold a commission in the army? A. Yes.

"Q. Did you go through Officer's Candidate School? A. I went through Cadet Training School.

"Q. Did you to to Craig Field, Alabama in your training? A. Yes.

"Q. Were you acquainted with Cameron Hart? A. Yes.

"Q. How did you become acquainted with him? A. We lived in adjoining rooms and went through most of our training together.

"Q. Did he also go to Craig Field? A. Yes.

"Q. Did both of you become officers at the same time? A. Yes.

"Q. When were you commissioned as officers—when was that? A. May 28th, 1943.

"Q. How long had you known him before that date? A. Approximately two and one half months.

"Q. During the period immediately preceding May 28th, when you were commissioned, you and Hart both, were you required to file an unusual amount or kind of papers? A. Yes; many of them.

"Q. How long did this preparation and filing of papers take place before you were commissioned? A. The signing of the papers towards our commissions started a week or ten days before that.

"Q. Do you recall whether or not you were required to sign an unusual amount of papers or am—did you have to sign any papers or make any unusual arrangements on May 27th or May 28th of 1943? A. Yes; that started May 26th or May 27th because before we could graduate we just had to sign all these applications and forms. That lifted us from Cadet status to Officer status.

"Q. Tell us what some of these instruments were and applications that you had to execute. A. There were medical reports and supply records, insurance forms, power of attorney and things like that.

"Q. I notice that you included insurance forms. What were you supposed to do with reference to any insurance forms. Did they have anything to do with the beneficiaries of the insurance? A. One reason for the changing of the insurance was that then the paying of the insurance was up to us instead of the Government paying for the insurance as we would then be officers and if we were going to change the beneficiary of the insurance policy, that was the time to do it.

"Q. Do you remember approximately the date that Cameron Hart married? A. Hart got married, I think, on the day following but on that day he was not married.

"Q. When did he get married? A. He was married—I can't remember the day if it was the afternoon of the twenty-eighth or early in the morning of the twenty-ninth. I believe it was in the morning of the twenty-ninth.

"Q. On the date of the 28th of May, 1943, did you yourself go through this routine of making necessary changes in your insurance? A. Yes; I did on the 27th, I think.

"Q. In order to do this and go through this routine of changing your insurance, what was done to change the insurance? A. By standing in line, as usual.

"Q. Was Hart standing in line with you? A. He was in line right in front of me.

"Q. He was directly in front of you? A. Yes.

"Q. Had Hart ever said anything to you or said anything in front of you about effecting any change in the beneficiary of his G. I. life insurance? A. Yes.

"Q. When and where and under what circumstances? A. The first time was at one of our bull sessions in the barracks the night of the 26th. We were talking about getting the papers all set up and in order for the next day and the next day he also mentioned that again.

"Q. Let me interrupt there. On the evening of the 26th, did he make mention at that time about changing the beneficiary of his insurance? A. Yes.

"Q. What changes did he say he was going to make? A. He told me he was going to change it to have his future wife be the beneficiary as he was getting married right after graduation.

"Q. On the occasion that you were standing in line on May 27th, he was directly in front of you? A. Yes.

"Q. Did he make any remark at that time about changing the beneficiary of his insurance? A. Yes; he mentioned the same thing, that he was going to change his beneficiary so that he would not have to worry about the insurance when he got some place else. We did not know where we were going. At that time we thought that would be our last chance to make a change and he told me that he was going to do it then.

"Q. Did he mention at that time what change he intended to make in the bene-

ficiary status of his life insurance? A. Yes; he was going to make his future wife his beneficiary.

"Q. When that was said to you by Hart while you two were standing in line on May 27th, what period of time elapsed between the time he made that statement and the time he reached the desk to make the necessary changes in his life insurance? A. We were not in line for more than a half hour. I imagine that it didn't take more than fifteen to twenty minutes before we got to the desk.

"Q. It was about fifteen minutes between the time he made that statement to you in line and the time he reached the desk to make that change? A. Yes.

"Q. Do you recall where and who was present besides yourself at the time you and Hart discussed the fact that he was going to change his beneficiary? A. Well, I can't remember who was present. We had a lot of those bull sessions. I can't remember the names of the others.

"Q. Do you recall what brought that particular subject up? A. Well, there was the announcement on the bulletin board that we would have to settle those matters. We were talking all about these different papers and the medical and insurance forms.

"Q. At that time he volunteered the information to you that he was going to change the beneficiary of his policy to his future wife? A. Yes.

"Q. But he was not married at that time? A. No.

"Q. You didn't see him actually make the change, did you? A. No.

"Q. With the exception of the conversations you had with him you don't know whether he changed the beneficiary or not? A. No; I wouldn't be positive."

Testimony of Helen Frick Hart.

"Q. Where do you live, Mrs. Hart? A. 631 Dorian Road in Westfield.

"Q. You are the plaintiff in this suit against the Government? A. Yes.

"Q. Are you the widow of Captain Cameron Hart? A. I am.

"Q. When did Captain Hart die? A. January 16, 1946.

"Q. When were you and Captain Hart married? A. May 29, 1943.

"Q. Where were you married? A. In Selma, Alabama, at Craig Field.

"Q. What day was it that he graduated? A. May 28, 1943.

"Q. And were you married at that time? A. We were married the next morning.

"Q. When did you first have any discussion with Captain Hart with reference to his life insurance? A. Well, the first time he mentioned life insurance was the day before we were married.

"Q. What date was that? A. May 28th.

"Q. What year? A. 1943. He came home late from the field and by way of explanation he said that he was changing—

"Q. At that time, May 28, 1943, I believe you said— A. Yes.

"Q. —Captain Hart had graduated as a student— A. Yes.

"Q. —he was then a second lieutenant? A. Yes.

"Q. And he talked to you about his insurance? A. Yes.

"Q. Where did this conversation take place? A. In the lobby of the Albert Hotel in Selma.

"Q. Who was present at the time? A. My mother, Mrs. Frick, and my sister, Miss Frick at that time, and my father and mother-in-law, Mr. and Mrs. Hart.

"Who are parties to this suit? A. Yes, sir.

"Q. What did Captain Hart say? A. He apologized for being late and he said that he had so many things to take care of and so many papers to sign and he mentioned some specifically, such as his change in marital status, which would change his pay, and he had changed the beneficiary on his insurance.

"Q. Had changed it to whom? A. To me.

"Q. Was that in the presence of these people you have just mentioned? A. Yes, it was.

"Q. Subsequently when you were in Florida did you have any discussion with

reference to the life insurance? A. Yes, we did.

"Q. What were the circumstances surrounding the discussion? A. Well, when we landed in Tallahassee I found a room and Cam went out to the field and when he came back that night it was quite late and he told me he was going overseas in 30 days and he wanted to tell me about the state of his affairs.

"Q. Did he say anything about the insurance at that time? A. Yes, he did, he said that if anything happened to him overseas that I would get a Government pension and his $10,000 life insurance.

"Q. Did he say anything as to how you would get the insurance? A. Yes, he did. He told me that I could take it in life-time payments or payments to cover a period of 20 years, and he preferred me to take the payments to cover twenty years. He said it was up to me but he thought it would be a wiser way for me to do it.

"Q. After your husband talked with you at Tallahassee 30 days prior to the time he went overseas— A. Yes.

"Q. —did he ever talk to you again about his life insurance? A. No, We didn't talk about it again.

"Q. And he returned to this country some 13 months after he was overseas? A. Yes.

"Q. And remained in this country? A. Yes.

"Q. And he died in this country, is that right? A. Yes."